**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | ) ) ) | |
| **Plaintiff,** | ) ) | **No. 09 CV 5637** |
| **v.** | ) ) | **District Judge Ronald A. Guzman** |
| **SUPERVALU, INC. and , JEWEL-OSCO, an operating unit of SUPERVALU, INC.** | ) ) ) ) | **Magistrate Judge Michael T. Mason** |
| **Defendants.** | ) ) | |

To:    **The Honorable Ronald A. Guzman
       United States District Judge**

<u>**REPORT AND RECOMMENDATION**</u>

Michael T. Mason, United States Magistrate Judge:

Currently pending before this Court is the EEOC's Motion for Civil Contempt Sanctions [160].   For the reasons explained below, the Court recommends that the District Judge grant the motion and impose sanctions as described herein.

<u>**Background & Procedural History**</u>

On September 11, 2009, the Equal Employment Opportunity Commission ("EEOC") sued Supervalu, Inc. and Jewel-Osco (collectively referred to as "Jewel"), alleging that the company violated the Americans with Disabilities Act ("ADA").  More specifically, the EEOC alleged in its complaint that Jewel prohibited disabled employees from returning to work after disability leave unless they could return without any accommodation, and that Jewel terminated such employees at the end of the one-year leave period.  *See* Complaint, p. 1 [1].  On January 14, 2011, the parties entered into a

Consent Decree [148] in full resolution of the claims and issues arising out of the

EEOC's complaint.  The Consent Decree, *inter alia*, enjoined Jewel from "discriminating

on the basis of disability by not providing reasonable accommodation(s) to persons

desiring to return to work from a disability leave."  Consent Decree, ¶5 [148].

On March 26, 2012, the EEOC filed a motion seeking civil contempt sanctions

against Jewel based in part upon the company's failure to honor ¶5 and seeking limited

discovery on the issue [160].  Judge Guzman referred the matter to this Court.  On

August 8, 2012, we issued a Report and Recommendation, which recommended, in

relevant part, that the District Court deny the EEOC's request for discovery and deny its

request for an evidentiary hearing to adjudicate the merits of Jewel's decision to not

accommodate Irene Pillie, Darsheta Epting, and Brooke Groszek  [174].[1]   The parties

filed written objections to the Court's Report and Recommendation and, on March 19,

2013, the District Court issued a decision sustaining in part and overruling in part those

objections.  The District Court sent the matter back to this Court to oversee the

discovery sought by the EEOC concerning the alleged violations of ¶5 and to conduct

any necessary evidentiary hearings and associated conferences [190, 191].   Jewel

asked the District Court to reconsider its ruling, and the court declined.

Thereafter, the parties engaged in some limited discovery and, pursuant to the

referral, this Court conducted evidentiary hearings on March 17 and 18 and April 7,

---

[1]As will be explained in greater detail below, Irene Pillie, Darsheta Epting and
Brooke Groszek all worked for Jewel; all three were granted a period of disability leave
by the company and then asked to return to work, with reasonable accommodations for
their resulting physical restrictions; all three were denied the opportunity to return to
work at Jewel.

2014. This Report and Recommendation constitutes the Court's findings of fact and conclusions of law.

**The Consent Decree**

As already noted, the Consent Decree executed by and between the EEOC and Jewel enjoins the company "from discriminat[ing] on the basis of disability by not providing reasonable accommodation(s) to persons desiring to return to work from a disability leave." Consent Decree, ¶5 (Joint Exhibit ("JX") 1). By its terms, the Consent Decree covers all employees at every Jewel and Jewel-Osco store in Illinois, Indiana and Wisconsin. Consent Decree (JX1), ¶2.[2] The Decree defines "disability leave" to mean "a leave of absence due to the employee's own 'disability' as defined by the ADA, as amended, including when employees take such a leave in conjunction with a short term disability leave or a workers' compensation leave." Consent Decree (JX1), ¶3.

By its terms, the Consent Decree, entered January 4, 2011, was to remain in effect for three years. The Decree includes a provision, however, that automatically extends its duration if disputes concerning compliance are pending at the time. In that case, the "term of the Decree shall be extended automatically (and the Court will retain jurisdiction of this matter to enforce the Decree) until such time as all such Disputes have been resolved." Consent Decree (JX1), ¶40. As explained above, the present dispute was pending when the Decree was set to expire on January 4, 2014, and there is no question, therefore, that the Court has jurisdiction to resolve the dispute and enforce the Decree to the extent necessary.

---

[2]Pillie, Epting and Groszek all fall within this group.

3

Among other provisions, the Decree required the company to pay monetary awards to certain eligible employees identified in an attached list (a list that did not include Pillie, Epting or Groszek), and it required the company to provide training to the members of its Medical Accommodations Administration Team (those employees responsible for ensuring that the implementation of the company's disability leave complies with the ADA, *see* Consent Decree (JX1), ¶32) regarding the company's duty to accommodate, the procedures for providing accommodations, and the range of available accommodations. Consent Decree (JX1), ¶14. Additionally, the Decree required the company to engage a "job description consultant" to assist in solidifying the company's job descriptions, and an "accommodations consultant" to assist the company "in identifying possible accommodations to common physical limitations experienced by the company's employees." Consent Decree (JX1), ¶¶16-22, 23-30. The Decree included an attached list of prospective accommodations consultants and required the company to select a consultant from that list. Consent Decree, (JX 1), ¶23.

Specifically with respect to the accommodations consultant, the Consent Decree spelled out the process by which the Accommodations Consultant would prepare his report. The process required the company to provide input and information, reasonable access to stores, and reasonable interviews of employees; allowed the company to raise objections to the contents of the report; and then required the company, within 60 days of receiving the report, to start using the accommodations consultant's report, "along with other potential reasonable accommodations, if any, for consideration in the individualized accommodation process for its . . . employees, unless a recommendation on the List is unreasonable, would impose a substantial or undue hardship, violates the

4

terms of the ADA, as amended, or another law, or the Company otherwise determines that it is unable to use all or part of the List." Consent Decree (JX1), ¶28. Consistent with this process, the company selected Paul J. Schwartz to be its Accommodations Consultant. Schwartz prepared a report, which was issued on September 30, 2011. *See* PX2. The Consent Decree also provided a process by which the company could challenge Schwartz's list of possible accommodations; to the best of the Court's knowledge, the company did not invoke that provision.

**The EEOC's Contempt Motion**

The EEOC seeks contempt sanctions based upon the company's treatment of three individuals: Irene Pillie, Darsheta Epting, and Brooke Groszek. Specifically, the EEOC argues that the EEOC violated ¶5 of the Consent Decree when it failed to return each of these three employees to work after their respective disability leaves. The Court provides some brief background with respect to each of the three employees below.[3]

a.   Irene Pillie:

Irene Pillie began working for Jewel in 1968. During the course of her decades-long career at Jewel, Pillie worked various jobs at various stores: she worked as a produce manager and a grocery clerk, as an associate in the dairy department, as the second person in produce, as a receiving clerk, a cashier and a pastry hostess; and she worked at two different Fox Lake stores, the Libertyville and Crystal Lake stores, the

---

[3]These summaries are drawn largely from the parties' documentary evidence; the testimony from, and relating to, each of the three employees is detailed separately in the next section.

store at Golf and Milwaukee, and stores in Antioch, McHenry, Wheeling, Streamwood, Arlington Heights and Rolling Meadows. She worked on both part-time and full-time bases.

After having shoulder surgery, Pillie took a disability leave. At that time, she worked as a part-time produce clerk in the new Fox Lake store, a job she had held since 2000. After surgery, Pillie was limited to lifting 10 pounds with her left arm, and was limited to lifting 20 pounds total. An April 15, 2010 work status report from Crystal Lake Orthopaedic Surgery indicated that Pillie could return to work as of May 1, 2010 with no overhead use of her left arm, no repetitive activity, and no pushing, pulling or lifting greater than 5 pounds. JX58, p. JEWEL_OSCO00000732. Pillie provided the work status report to Jewel and an internal Jewel email concluded that "[c]learly, Ms. Pillie could not perform a majority of the essential functions of her or really any other job in the store with the current level of restrictions in place." JX 58, p. JEWEL_OSCO00000734.

An August 24, 2010 work status report from Crystal Lake Orthopaedic Surgery states that Pillie has a "[p]ermanent 10 lb lifting restriction." JX 31. Pillie provided the report to Jewel and sought a return to work with accommodations for her medical restrictions. A September 2, 2010 internal email from the then Medical Accommodations Administrator to the Fox Lake store director concludes "we have agreed that your store cannot accommodate Ms. Pillie's permanent 10 pound lifting restriction. I have discussed the matter with Ms. Pillie and she understands that this is not something your store can presently accommodate." JX 58, p. JEWEL_OSCO00000741. Internal documents from the Medical Accommodations

6

database indicate that the discussion concerning accommodations was limited to Pillie's

past job as a produce clerk; the notes indicate that the Medical Accommodations

Administrator and the assistant store director ("ASD") did discuss a possible transfer to

a scan coordinator position, but that the ASD said he did not have any open positions to

offer at that time.  JX 58, p. JEWEL_OSCO00000743.  The database notes further

indicate that the Medical Accommodations Administrator discussed the matter with Pillie

and that Pillie

> wondered about any other position within the store and wanted me to
> understand that she was open to anything we might be able to suggest.
> She even offered to be a 'parceler'. I explained that they even need to be
> able to lift over 10 lbs. as certainly any given bag with groceries is going to
> likely weigh over 10 lbs., let alone many products on their own.  We
> discussed the potential scan coordinator, but I explained that they already
> have more scan coordinators than what they need, so this would not be
> something we could offer to her.

JX 58, p. JEWEL_OSCO00000743.

While Pillie was on leave, Jewel sent her several letters.  The first, dated July 12,

2010, advised Pillie that her disability leave would exhaust on January 26, 2011, and

that if she did not return to work by that date her employment would be terminated. JX

44.  The second letter, dated October 23, 2010 – after Pillie sought to return to work –

reiterated that Pillie's leave entitlement would be exhausted on January 26, 2011, and

explained what would happen with respect to her benefits and healthcare coverage if

she did not return to work.  *See* JX 45.  The last letter, dated February 5, 2011, advised

that "[s]ince you will not be returning to work, your active employment with Jewel-Osco

will terminate as of January 26, 2011.  JX 46.  On January 28, 2011, Sharon Rosy,

Jewel's Medical Accommodations Coordinator,  sent an email to Ruth Craig (the human

resources person who had written the letters to Pillie) telling her to terminate Pillie's employment.  JX 58.  After being fired from Jewel, Pillie looked for work but was unable to find a job until April 1, 2013, when she started work as a cashier at Target.

  b. <u>Darsheta Epting:</u>

  Darsheta Epting began working for Jewel in June 2000.  During her tenure there, she worked at a number of different stores and in a number of different positions – most recently, she worked as an assistant store director on the Osco side.  Epting took a disability leave in September 2010 because of a back injury.  She received a release to return to work in December 2010 with restrictions that limited her to "no lifting greater than 10 lbs. for five days, no continuous standing for five days, no bending or twisting for five days"; she was also limited to working five hours per day, five days per week for six to eight weeks.  Epting sought a return to work with accommodations. Jewel advised Epting that it could not accommodate her request.

  Epting submitted a second request to return to work with accommodations in January 2011.  The medical releases accompanying that request indicated that Epting was limited to working eight hours a day, five days a week for four weeks and that she had a 20-pound lifting restriction, as well as restrictions on bending (occasional) and stooping/twisting (never).  Jewel determined that, with these restrictions, Epting could not return to her past job as an assistant store director; in so doing, the company rejected Epting's suggestion that she could use "the buddy system" when she had lifting issues.  Notes from the company's Medical Accommodations database indicate that the company never considered transferring Epting to another position and that the company only considered whether Epting could do her past job with the medical restrictions she

had.  *See* JX6, pp. JEWEL_OSCO00000232-233.  Additionally, the notes, dated

January 18, 2011, indicate that the solution of having another employee assist her when

she needed to perform tasks that would have been precluded with her restrictions was,

given staffing capacity, "not reasonable to store operations."  *Id.*, p.

JEWEL_OSCO00000233.

Epting resigned via email on March 17, 2011.  *See* JX 6, p.

JEWEL_OSCO00000246.  While she was on leave but before she resigned, Epting

found work with Bank of America making less than she made at Jewel.

c.      Brooke Groszek:

Brooke Groszek began working for Jewel in 2007.  She worked as a deli clerk at

Jewel's New Lenox store.  Groszek injured her left shoulder and, as a result, was off

work for a period of time.  Groszek had surgery February 26, 2010.  Her recovery was

hampered when her wound got infected, but she received treatment for the infection, as

well as physical therapy, cortisone injections and a home exercise regimen.  *See, e.g.*,

DX 30.  She requested a return to work, with accommodations for her restrictions, in

February 2011.  According to a functional capacity exam conducted January 7, 2011,

Groszek had decreased left upper extremity strength with lifts and at or above shoulder

height; the report included very specific and detailed information about what she could

and could not do and how often she could do it.  *See* JX 23.   A work status report from

Hinsdale Orthopaedics indicated that Groszek could return to work with permanent

restrictions of no overhead activities and with lifting restrictions of 5 pounds waist to

crown and 15 pounds floor to waist.  *See* JX 26, p. JEWEL_OSCO00000814;

Defendant's Exhibit ("DX") 43, p. GROSZEK0141.

9

Groszek received several letters from the company during her leave.  She received a letter dated July 31, 2010 advising her that her leave entitlement would exhaust on March 1, 2011.  *See* JX 21.  She also received a letter dated November 26, 2010 reiterating that her leave entitlement would exhaust on March 1, 2011.  *See* JX 25. And she received a letter dated April 23, 2011, which again highlighted her March 1, 2011 leave exhaust date, and advised her that if she was unable to return to work (she had not returned to work as of the date of the letter) her "active employment with Jewel-Osco will terminate as of your leave exhaust date referenced above."  JX 27, p. JEWEL_OSCO00000423.  The letter further advised Groszek that if she was released to return to work she should contact her store director or HR manager – something she had already done with her February 2011 work status report.  And, finally, the letter advised her that, "[s]ince you did not return to work by your leave exhaust date, your employment has been terminated as of March 01, 2011."  *Id.*, p. JEWEL_OSCO00000424.

The record includes an undated email sent to Ruth Craig, the HR manager, advising Craig to terminate Groszek for exhaustion of her fifty-two week leave entitlement.  JX 20, JX 28.  Medical Accommodations database notes show that, at the time her medical leave was exhausting, Groszek "stated that she has restrictions that do not allow her to perform the functions needed to perform her job.  We discussed that she will be terminated from the company & she said that she understood."  JX 28, p. JEWEL_OSCO00000425.  Notes from April 15, 2011 state that the company representative asked Groszek "if there was anything the company could assist her with or provide her that would allow her to perform the functions and she said that 'she did

not think so.'  She stated that 'all the jobs within the store were physically difficult.' She

further stated that she has been off work for approximately 1.5 yrs and that she had

taken this opportunity to go back to school; she is going to get a position that is not

physical."  JX 28, p. JEWEL_OSCO00000426.  Groszek was unable to find a job until

July 2013; she now works as a "visual" at Carson's, where she is responsible for

decorating and setting up displays.

**Testimony from the Evidentiary Hearing**

As explained, the Court conducted a three-day evidentiary hearing on the

EEOC's motion.  At that time, in addition to the documentary evidence discussed above

and in this section, the Court heard from each of the three employees who had allegedly

been discriminated against in connection with their attempted return to work after

medical leave.  The Court also heard from Sharon Rosy, Jewel's Medical

Accommodations Coordinator[4],  as well as various other individuals who work for Jewel

in some capacity, and Paul Schwartz, a Rehabilitation Engineer and accommodations

specialist selected by Jewel to prepare the accommodations report contemplated in the

Consent Decree.

Rosy testified that she has worked for Jewel since 1986 and that she has had

responsibility for responding to employees' accommodation requests at Jewel and Osco

retail stores since March of 2008.  Tr., pp. 7-8.  She testified that, in that capacity, she

handles approximately 1100 accommodation requests each year.  Tr., p. 9.

---

[4]Ms. Rosy is technically now employed by New Albertsons, which owns both the
Jewel and Osco business units.  Ms. Rosy remains responsible for overseeing medical
accommodations issues for Jewel and Osco stores and employees.  Tr., pp. 6-7.

With respect to the Consent Decree, Rosy testified that she first saw the document in January of 2011, when the company entered into it.  Tr., p. 11.  She testified that she was aware that ¶5 of the Consent Decree required the company to provide reasonable accommodations to persons desiring to return to work from a disability leave. Tr., p. 12.  She testified that she understood that the company had an obligation to return to work employees who were willing and able to do so with or without reasonable accommodation.  Tr., pp. 12-13.  Rosy testified that she and her team were operating on their own with respect to accommodations decisions; she testified that no one monitored their decisions and that neither she nor her team members had to get approval to terminate employees on disability leave.  Tr., pp. 12-13.  She also testified that, from 2011 on, she had final authority to decide whether Jewel could accommodate an employee who wanted to return to work from a disability leave.  Tr., p. 13.

Rosy testified that it was her understanding that the company must consider reassignment to an open position as a reasonable accommodation under the ADA, and that the company must also consider providing assistive devices as a way to provide reasonable accommodations.  Tr., pp. 14-15.  Rosy testified that, in 2011, the company prepared job descriptions for its positions, which included "physical action requirements" for each job – standing, bending, stooping, reaching, lifting, grasping, etc. Tr., pp. 16-18.  But Rosy also testified that, although each case is individual, in some cases, employees can be accommodated who can't meet those physical action requirements; in other words, in some cases, employees who cannot perform the physical action requirements of the job, can still perform the job, with an accommodation.  Tr., pp. 18-19.

12

By way of example, the EEOC introduced the job description for the cashier position, which included physical action requirements indicating that the position required, among other things, the ability to stand continuously and the ability to lift less than 10 pounds continuously, 10-20 pounds frequently, and 20-40 pounds seldomly. JX 24. And then the EEOC introduced evidence showing that Rosy had offered to return employees to the cashier position who could not meet those physical action requirements. For example, the EEOC introduced a letter Rosy wrote to Nancy Hagstrom on May 2, 2013, offering to return her to work in a cashier position with a 15-pound lifting restriction and a four-day-a-week schedule. Plaintiff's Exhibit ("PX") 20. Rosy testified that she had, in fact, authorized and signed the letter offering Hagstrom that accommodation. Tr., p. 21-22. The EEOC also introduced a letter Rosy had written to Phyllis Wilcher on May 2, 2013, offering a return to work to a cashier position, with a 15-pound lifting restriction and a four-to-six-hour-a-day schedule. PX 33. Rosy testified that she had, in fact, authorized and signed the letter offering Wilcher that accommodation. Tr., pp. 22-23.

Similarly, the EEOC introduced a letter Rosy wrote on May 2, 2013 offering to return Darlene Runyon-Kaiser to a cashier position "with an accommodation of Half of schedule standing; half sitting." PX 28. And Rosy testified that she had, in fact, written that letter and made that offer to Runyon-Kaiser. Tr., pp. 24-25. The EEOC also introduced evidence showing that the company had offered to accommodate another employee who could lift no more than 10 pounds and had no use of her left arm and another employee who could do no bending/twisting/stooping and could lift no more than 10 pounds. *See* PX 15, PX 17. Again, Rosy conceded that these

13

accommodations had been made.  Tr., pp. 25-26, 28-30.

Rosy conceded that the company offered some employees a reasonable accommodation that exempted them from performing the essential functions of their job. Tr., p. 35.  She also conceded that, to trigger the interactive process required under the Consent Decree, an employee who was out on disability leave simply had to request to return to work and present restrictions.  Tr., p. 36.  She testified that, once the interactive process was triggered, the company's guidelines provided that the company should then collect information from the employee and his or her health care providers, as well as the business unit and manager; the guidelines further provided that the company should collect information regarding possible reassignments, as well as job modifications.  Tr., pp. 36-37.

Rosy testified that, in 2010 and 2011, she followed the company's interactive process guidelines; she initially testified that with respect to part-time and full-time employees, she followed the guidelines and collected information regarding possible job reassignments.  Tr., p. 43.  She then admitted, however, that she did not routinely look at job reassignment information for part-time employees.  Tr., pp. 46-47.  She testified that the company training materials indicated an expectation that the company would review open available jobs in other business units as a reasonable accommodation. Tr., pp. 49-50.  She testified that, in her view, "other business units" meant other store locations and other assignments; she testified that she did not routinely look at open jobs in the home office as part of this expectation.  Tr., pp. 49-50.

Rosy testified, on questioning from Jewel, that the interactive process basically involved having the employee present three forms – a general information sheet, a

14

documented restrictions sheet from the medical provider, and a signed medical release

authorization.  The medical accommodations team would then review those forms and

either discuss them with the associate or discuss them with the store director to verify

whether the associate would be accommodated, and then they would report to the store

management.  Tr., p. 59.  She testified that, in some cases, the medical

accommodations team spoke directly with the associate, but in other cases, the team

told the store manager whether the associate would be accommodated or not, and then

the manager would convey that decision to the associate.  Tr., p. 59.  She testified that,

in most (but not all) cases, the team spoke with the associate directly to verify the

restrictions, to go through the job functions and to talk to the associate about what

functions the associate could and could not perform based upon the restrictions; if the

associate could not perform the essential functions of his or her past job, they would ask

whether there was another position that he or she would be interested in within the

store.  Tr. , p. 60.  Rosy testified that, in some cases, the team reached out to the

medical provider directly, for example, if the restrictions were not clear or if the

associate disagreed with them, they might reach out to the provider for verification.  Tr.,

p. 60.   Rosy testified that, during 2010 and 2011, the company had a policy of reaching

out to employees on leave at 26 weeks (the halfway point of the allowed leave), 40

weeks and 52 weeks.  Tr., p. 61.

Rosy testified that, prior to September 30, 2011 she never tested any assistive

lifting devices in any Jewel store, had never taken any steps to learn about assistive

devices for people with lifting restrictions, had never offered an employee with a lifting

restriction an opportunity to test a lifting device to see if it would enable the employee to

15

perform the essential functions of any job, and had never utilized any of the resources available to her to find out about assistive devices.  Tr., pp. 53-55.  She testified, however, that she is generally familiar with assistive devices because of her background in rehabilitation; she also testified that she never felt the need to reach out to the available experts in the accommodation field because she knows the jobs at Jewel, having worked there for 27 years; she testified that she knows the positions and she knows the store layouts.  Tr., pp. 66-67.   She admitted, however, that she is not an expert on assistive devices.  Tr., p. 74.

Rosy also testified that Jewel had a program called "TAW" – the Temporary Alternative Work program, where the company would return to work an employee with restrictions, without evaluating whether the employee could perform the essential functions of his or her job; the employee would simply be given tasks that were within his or her restrictions.  Tr., pp. 68-69.  Rosy testified that the program was only available to employees who had suffered work place injuries and lasted just 90 days (though she was aware of cases where the TAW lasted much longer).  Tr., p. 69.

Rosy testified that, under the Consent Decree, she was to be evaluated on her ability to facilitate compliance with the ADA; she testified that she was never advised that her work needed improvement in this regard.  Tr., p. 56.
Rosy testified that, since January of 2011, when the Consent Decree was entered, her department has received approximately 3,400 accommodation requests; of those, approximately 2,300 were granted.  Tr., p. 77.

After questioning Rosy in general about the Consent Decree, Jewel's interactive process and her work with respect to medical accommodations, the parties then turned

to the particulars surrounding the individual employees whose situations triggered the filing of the EEOC's contempt motion – Irene Pillie, Darsheta Epting and Brooke Groszek.

      a.    <u>Irene Pillie</u>

Rosy confirmed that Irene Pillie was a long-time Jewel employee who was on disability leave after having a shoulder replacement surgery, and that she submitted her paperwork to return to work with Jewel as of August of 2010. Tr., p. 80. Rosy testified that, when she went out on leave, Pillie was working as a produce clerk, and that she asked to return to work with lifting restrictions. Tr., p. 80. Rosy testified that Pillie was cooperative during the interactive process and provided everything the company requested in the way of documentation; she testified that Pillie advised the medical accommodations team that she was interested in other positions at Jewel, including the scan coordinator position. Tr., p. 81.

Rosy recalled that Pillie wanted to return to work with a 10-pound permanent lifting restriction. Tr., p. 84. She testified, referring to the company's scan coordinator job description (JX 52), that an associate in the scan coordinator position would never be required to lift more than 30 pounds and would seldom be required to lift even as much as 10 pounds. Tr., p. 84. Rosy testified that the company advised Pillie that there were no scan coordinator positions available in the Fox Lake Store, where she had worked before going out on leave. Tr., p. 85. Pillie remained on leave until January 26, 2011, when she was terminated. Rosy testified that, from the time Pillie presented her return to work paperwork until the time she was terminated, no one from the medical accommodations team ever contacted anyone at the Fox Lake Store to see if any

17

additional scan coordinator positions opened; nor did anyone from the medical accommodations team contact any other stores during that period to see if they had any open scan coordinator positions.  Tr., pp. 85-86.   Referring to documents produced by Jewel in discovery, Rosy confirmed that there were, in fact, at least two open scan coordinator positions in the same region as the Fox Lake store during the time period between when Pillie asked for the accommodation and when the company fired her.  Tr., pp. 89.  Rosy testified that there was nothing in any of the collective bargaining agreements that would have prevented Pillie from taking a scan coordinator position.  Tr., p. 90.

Rosy testified that no one at Jewel ever talked to Pillie about these positions.  Tr., p. 90.  She also admitted that no one from the medical accommodations team ever sent any requests to any store directors requesting any information about any open positions that would have been within Pillie's job restrictions. Tr., p. 90.   Rosy also testified that no one at Jewel ever tried to see if Pillie could perform the duties of a cashier position, with or without accommodation, despite the fact that she was aware that the company had accommodated associates with 10-pound lifting restrictions in the cashier positions .  Tr., pp. 90-91.  Rosy testified that, with the exception of checking one time to see if there were any open scan coordinator positions in one store, the company did not look for or consider open positions for Pillie.  Tr., p. 99.

On questioning from the EEOC, Rosy admitted that no one ever asked Pillie if she was interested in a job at another store.  Tr., p. 119.  And she testified that the company will typically consider assistive devices even if an employee doesn't ask for one; it just didn't do so in Pillie's case.  Tr., p. 121.

18

The EEOC introduced into evidence records from the company's medical accommodation database relating to Pillie.  *See* JX 58.  The notes in the database indicate that Pillie asked the company to return her to any open position, but the company declined to do so.  In particular, the notes indicate that Pillie suggested the scan coordinator position, but the company told her they already had too many of those. See JX 58, p. JEWEL_OSCO00000743 (notes dated 9/2/2010).  At the hearing, Rosy testified that the company did not consider other open positions for Pillie because she was a part-time employee and part-time employees typically want positions "closest to their home"; Rosy also testified that Pillie never requested a cashier position.  Tr., p. 107.  Rosy also testified that Pillie never requested any kind of assistive device to help her perform the essential functions of her job, and never asked to look at a position in a different store.  Tr., pp. 108, 117.

After Rosy, the Court heard from Pillie, who testified about the many positions she has held in her decades with Jewel, and she explained that she has worked at many different Jewel stores throughout her tenure.  Tr., pp. 128-129.  She testified that she had shoulder replacement surgery and, afterward, was restricted to lifting no more than 10 pounds with her left arm and no more than 20 pounds with both arms.  Tr., p. 127.  She testified that Jewel fired her in 2011 because of her lifting restrictions.  Tr., p. 128.  At the time she was fired, she worked as a part-time clerk in the produce department at the Fox Lake store.  Tr., p. 129.

Pillie testified that she was right-handed and that her more restricted arm was her non-dominant one.  Tr., p. 130.  She testified that her doctor cleared her to return to work in August of 2010 and that she then contacted the HR person at Jewel.  Tr., p.

19

130-132.   Pillie testified that she knew she "couldn't work produce" but that she told the

Jewel that she wanted to come back to work and that she would be willing to work at a

different store or in a different position, and she suggested the scan coordinator

position.  Tr., p. 133.  She testified that she was told that there weren't any scan

coordinating positions open at that time.  Tr., p. 133.   She testified that she advised

Jewel that she was willing to work in other stores, but was told there was nothing

available.  Tr., pp. 136-137.

Pillie testified that when Jewel fired her, she was "really upset" and "very hurt

about it"; she testified that she thinks she could have performed the job duties of a

cashier at Jewel; in fact, she testified, she was working at the time of the hearing as a

cashier for Target, which requires more lifting than the cashier job at Jewel.  Tr., pp.

135-136.  She testified that Jewel never even gave her a chance to prove whether or

not she could do the cashier job.  Tr., p. 136.   Pillie testified that she knew she could

not return to her old job as a produce clerk because it required heavy lifting, overhead

reaching and repetitive motions that she simply could not do with her shoulder

restrictions.  Tr., pp. 141-142.

Next, the Court heard from Paul Schnell, the store director of Jewel's Gurnee

location.  Schnell testified that he has worked for Jewel and/or Osco for forty years –

starting out as a service clerk, working to bag groceries and then stocking shelves; he

worked as a "micro chief, which was overnight working stock and running a crew" and

then as a grocery assistant, an assistant store director and then a store director.  Tr., p.

155.  Schnell testified that he has worked in at least thirty stores, including the Fox Lake

store where Pillie worked.  Tr., p. 156.  Schnell testified about the job posting process at

Jewel. Schnell testified that the company is able to accommodate between positions,
but that issues can arise with trying to accommodate a Jewel employee with an Osco
position, and vice versa. Tr., p. 158. Schnell testified that scan coordinator positions
are generally full time positions and that "it takes many years to get yourself really
familiar with that area of the business." Tr., p. 160. But then Schnell also said that, in
most cases, each store has both a full-time scan coordinator and potentially two or three
back ups, and he indicated that the back up scan coordinators tend to be part-time
employees. Tr., pp. 161. [5]

     b.   Darsheta Epting

     Darsheta Epting was an assistant store director for Osco; she was out on
disability leave and then, in January of 2011, she presented a medical release to the
company and asked to return to work. Tr., p. 163. Sharon Rosy testified that the
company's medical accommodations team received a request for accommodation from
Epting in January of 2011. Tr., p. 163. She testified that Epting was released to return
to work with several restrictions – a 20 pound lifting restriction, occasional bending, no
stooping or twisting, and she could work 8 hours/day, 5 days/week for the first 4 weeks.
Tr., 165; JX 6, pp. JEWEL_OSCO00000234 - 235. Rosy testified that, after considering

_____

    [5]Although it is not entirely clear, it would seem that Jewel wanted to offer
Schnell's testimony for the purpose of demonstrating that Pillie was not qualified for the
scan coordinator position. But there is no evidence to suggest that Jewel denied Pillie a
shot at a scan coordinator job because she wasn't qualified. Rather, the evidence is
clear that Jewel told Pillie the scan coordinator job was not an option because there
were no open scan coordinator jobs at her home store. *See* JX 58. And Rosy testified
that the company never even considered moving Pillie to another store, or transferring
her to full time employment, or transferring her to another position, whether it was
cashier or scan coordinator or anything else. Accordingly, the Court finds Schnell's
testimony to be largely irrelevant and gives little weight to it.

these restrictions, the medical accommodations team determined that Epting could not return to her job as an assistant store director.  Tr., p. 165.  Rosy admitted, however, that the company had agreed to return other employees to the assistant store director positions with similar restrictions.  *See* Tr., p. 172; Plaintiff's Exhibit ("PX") 25 (5/2/13 letter from Sharon Rosy to Carlos Porrata agreeing to return Porrata to work as of 1/23/12 "as an Assistant Store Director, with an accommodation of 20 lbs. Lift X4 Wks."); PX 29 (5/2/13 letter from Sharon Rosy to Rick Schroyer agreeing to return Schroyer to work, effective, 1/30/12, as an assistant store director "with an accommodation of 20 lbs. Lifting X3 Wks.").   Rosy also agreed that the company had accommodated an employee's return to work as an Osco Supervisor, with an accommodation of "30 lbs. Lift; 5 hrs/day; Bending/Stooping occ."  Tr., 192-193; PX 31 (5/2/13 letter from Rosy to Rihana Syed offering a return to work as of 12/6/11 with these restrictions).  Rosy agreed that a reduced schedule and a 20-pound lifting restriction could both be accommodated, at least sometimes, in the assistant store director position, and she admitted that Epting was not offered the opportunity to return to work with those accommodations.  Tr., pp. 173-174.

Rosy testified that there was no limit on the number of employees at a particular store who could be accommodated.  Tr., p. 178.  Rosy admitted that, at the time the company decided Epting could not be returned to work, it did not consider Epting for any other positions at the Jewel store where she had worked because she would not have been able to perform the essential functions.  Tr., pp. 182-183.  Rosy testified that, given Epting's restrictions, she probably could have been accommodated with a transfer to an open pharmacy tech position, and she probably could have fulfilled the essential

22

functions of that job with her restrictions; but the company did not offer to accommodate Epting in this role.  Tr., pp. 186-190.  Rosy testified that she considered whether Epting could perform other jobs on the Osco side, but she did not discuss the issue with Epting.  Tr., p. 192.  She testified that she always considers other positions when determining whether an employee can be accommodated, and that she considers any position she feels the employee may be capable of doing.  Tr., pp. 183, 192.  She admitted, however, that she never considered offering Epting the job of store set up coordinator, or the job of Osco market support person.   With respect to the store set up coordinator, Rosy testified that Epting could not have performed the essential functions of this job because it is "very physical"; she admitted, however, that the job description does not include any requirement for any particular physical capabilities and she admitted that it was possible that assistive devices might be used to enable a person with a 20-pound lifting restriction to do the job.  Tr., pp. 195-196.  Rosy testified that the company never offered Epting either of these jobs.  Tr., pp. 196-197.

Rosy also testified that there was no reason store employees could not be considered for jobs within corporate headquarters, as long as they met the qualifications for the specific positions; but she testified that she did not normally consider corporate positions for store employees looking to return to work from a disability leave.   Tr., p. 197.   Looking at a list of the positions that were open at Jewel and Osco at the time Epting sought to return to work, Rosy testified that she did not discuss any of these positions with Epting. Tr., p. 198.

Rosy admitted that, during the interactive process, Epting was cooperative; she never failed to respond to a request for information from the company, nor did her

health care providers. Tr., p. 205. On questioning from counsel for the company, Rosy testified that, in her discussions with Epting, Epting never asked to transfer to a different position; she never offered to take a union position, she never indicated she was willing to take a pay cut, never asked to transfer to a corporate position, never requested a marketing support position, never requested a pharmacy tech position, and never asked to use any assistive devices. Tr., pp. 208-10. Nor did Epting ever ask to be transferred to a different store. Tr., p. 212. Rosy testified that Epting did suggest that she could ask other employees to help her, but that, in Rosy's view, this was not a reasonable accommodation because Osco does not schedule enough employees at any one time to have extra assistance available throughout a shift. Tr., pp. 210-211. Rosy testified that it wouldn't be efficient and would take away from customer service. Tr., p. 211. Rosy acknowledged, however, that the company did not offer anything else in lieu of Epting's proposal. Tr., p. 217.

Rosy testified that Epting resigned – and that she did so in a way that did not trigger the need to reach out about a possible return to work; rather, when she resigned, Epting noted that the decision was difficult and that she was grateful for the rewarding employment she had with Osco. Tr., p. 210; JX 6, p. JEWEL_OSCO00000246 (Epting's 3/17/11 resignation email to Jewel Osco Human Resources Manager).

With respect to the evidence that Jewel accommodated other employees with similar restrictions, Rosy testified that those employees had temporary lifting restrictions, which are easier to accommodate than permanent restrictions. Tr., p. 214. Finally, Rosy testified that Epting acknowledged that she could not perform the essential functions of her job. Tr., p. 217.

24

Next, the Court heard from Epting, who testified that, at the time of the hearing, she was employed by Chase as a fraud investigator. Tr., p. 221. Epting testified that she worked for Jewel from June 19, 2000 until March 27, 2011, when she resigned. She worked first as a manager in training, then as an assistant manager and then as an assistant store director. Tr., p. 221. Epting testified that she worked at many locations during her tenure with Jewel, both in Illinois – at stores in Olympia Fields, South Chicago Heights, Homewood, Naperville, and New Lenox – and Indiana (both Munster and Dyer). Tr., p. 221. Epting testified that she took a disability leave from Jewel in September 2010, and that she was first released to return to work, with restrictions, in December 2010; she testified that the company told her that her restrictions (no lifting greater than 10 pounds, no continuous standing, no bending or twisting, working just five hours/day, five days/week) could not be accommodated and that she was told to basically come back when she could lift more weight. Tr., pp. 223-226. She testified that she asked to just have assistance with heavier lifting, but the company told her no. Tr., pp. 226. Epting testified that she obtained another release in January of 2011, releasing her to return to work with no lifting greater than 20 pounds, occasional bending and no stooping or twisting, working no more than eight hours/day, five days/week for four weeks. Tr., p. 227. She again asked to be returned to work and to be allowed to use assistance from other employees as needed for heavy lifting, but that the company said no. Tr., p. 228. Epting testified that Sharon Rosy told her to contact her when she could come back full time. Tr., p. 228.

Epting testified that, in her view, she could have performed the essential functions of the assistant store director job, which she testified was largely managerial.

25

Tr., pp. 229-231.  She also testified that, had Jewel given her the chance, she would have been willing to perform other jobs, including the pharmacy tech, pharmacy tech specialist and certified pharmacy tech jobs.  Tr., p. 232.  She testified that she also would have been willing to accept jobs on the Jewel side or in the corporate office, but that she was never offered an opportunity to test out any other positions.  Tr., pp. 239-240, 242.

Next, the Court heard from Ann Schilling, educational coordinator for Jewel.  Schilling testified that she provides training for new hires to the company, as well as continued training for associates, and that she has been employed with the company for almost thirty-five years.  Tr., pp. 310-311, 320.  Schilling testified that she also worked as a medical accommodations administrator from October of 2010 through February of 2011.  Tr., p. 311.  Schilling testified that she handled Epting's request to return to work.  Tr., p. 312.   She testified that, when she worked as medical accommodations administrator, she was training with another company employee, and that she "[w]orked extensively with her one-on-one for several weeks learning the process, leaning the rules of the ADA, and actually working alongside her as she handled medical accommodations."  Tr., p. 313.  Schilling testified that she was familiar with the EEOC regulations that say a reasonable accommodation may include "reassignment to a vacant position."  Tr., p. 313.   And she testified that "[i]f they would have asked for it, I would have considered it."  Tr., p. 314.   When asked whether it was her understanding that reassignment was only required if the employee asked for it, Schilling backpedaled a bit: she testified that "[I]f there was something that I would have thought that, you know, if it was a permanent restriction or something that there was something else

within the store that we could do, we would consider it." Tr., p. 315. She testified that it was the employee's restrictions that triggered whether she considered reassignment to an open position. Tr., p. 314. She testified that she considered reassignment when the employee's restrictions were permanent. Tr., p. 315.

Schilling also testified that she knew the EEOC regulations provided that a reasonable accommodation could include the use of assistive devices, but that she did not consider the use of such devices for Epting. Tr., p. 316. And she testified that she did not do so because Epting's restrictions appeared to be temporary. Tr., p. 316. Schilling testified that Epting never asked for an assistive device and she didn't offer Epting the option. Tr., p. 317. Schilling admitted on the stand that she made the determination that Epting could not return to work because she could not perform the essential functions of her job; she admitted that she did not offer Epting the use of any assistive devices to help her perform the essential functions of her job, nor did she offer her reassignment to a job she could perform. Tr., p. 318. She testified that, during her tenure as medical accommodations administrator, she never contacted the job accommodations network, never contacted the Assistive Technology Unit at the University of Illinois, and never met with Epting. Tr., pp. 319-320.

On questioning from counsel for Jewel, Schilling testified that she discussed Darsheta Epting with Jim Gawel, the store director at the store where Epting worked; they discussed which functions of her old job Epting could and could not do, given her restrictions. Tr., pp. 322-323. The short answer Gawel gave was: she couldn't do much. Tr., p. 323. Schilling also testified that, after talking with Gawel, she spoke to Epting, and Epting agreed that she would be unable to perform the tasks Gawel had

27

highlighted.  Tr., p. 324.  She also testified that Epting never suggested an accommodation that would allow her to perform the essential functions of her job, never asked for a transfer to a different position, and never asked for any assistive devices.  Tr., pp. 324, 326.  Schilling also testified about the training required for various positions within the company, including scan coordinator, bagger, trainers, and floral designer.  Tr., pp. 328-329.

Next, David Batjes testified for the company; he testified that he is a project manager for Jewel, an operations office job; he testified that he has worked in that job for six months and had worked at the company for twenty-nine years, starting out as a part-time clerk and working his way up to his current position.   Batjes spent a fair amount of time talking about what an assistant store director does, presumably to show that Epting could not do the job with her restrictions.  But no one is arguing that she could do the job – indeed, that's precisely the point: she wanted to return to work with restrictions and needed a reasonable accommodation in order to do so.  The company failed to provide any accommodation.

The company then showed a video reflecting the store layout for a Schaumburg Jewel store and showing how items are stacked and configured.  And Mr. Batjes provided a running commentary explaining what was seen in the video.  It is not entirely clear why the company wanted to show the video – possibly to show why Ms. Epting could not perform the essential functions of the assistant store director job with her restrictions, or possibly to bolster its contention that it would have been impossible or impractical to allow assistive devices in the store.  However, given that Epting agreed that she was unable to return to her assistant store director job, and given that Rosy

28

and Schilling testified that they did not consider the use of assistive devices, the video would seem to be irrelevant. And Batjes admitted on questioning from the EEOC that he is not an expert in store design or in reasonable accommodations.

      c.    <u>Brooke Groszek</u>

Rosy testified that she handles approximately 1,100 accommodation requests each year; she testified that this is what she does ten hours a day. Tr., p. 364. Rosy testified that she was familiar with Brooke Groszek, and was aware that Groszek had submitted return to work restrictions and requested a reasonable accommodation to return to work. Tr., p. 366. Rosy testified that Groszek submitted her return to work paperwork in February of 2011. Tr., p. 366. And she admitted that no one from the company contacted Groszek about her restrictions at that time; she testified that, instead, Jewel advised Groszek that she would be terminated if she was not returned to work by March 1, 2011. Tr., pp. 370-371. Rosy testified that, in fact, no one contacted Groszek until April 15, 2011 – about a month and a half after her termination date. Tr., p. 371. Rosy testified that, in discussing with Groszek her return to work, she (Rosy) did not suggest any other job Groszek could do in another store; nor did she propose anything specifically that could help Groszek do her job in the Chef's Kitchen; she testified that she did not explore any accommodation options that Groszek did not bring up; nor did she explore any jobs that Ms. Groszek did not come up with on her own. Indeed, Rosy testified that, in the company's view, Groszek could not be accommodated in any jobs at Jewel that were open at the time she was requesting a return to work. Tr., p. 380. Yet Rosy admitted that Groszek, even with her restrictions, could perform the essential functions of the job of floral clerk, Tr., p. 382, and the EEOC

introduced a March 31, 2009 letter from Rosy to another Jewel associate, Dorothy

Bobacek, reflecting that the company had accommodated Bobacek's lifting restrictions

by assigning her to a floral clerk position within the floral department. *See* PX 10.

Rosy also admitted that certain restrictions could be accommodated in the cashier

position, but that Groszek was not considered for a cashier position, even though there

were positions open at the time she was looking to return to work and Jewel was telling

her that she could not be accommodated. Tr., pp. 387-388. Rosy testified that the

company did not consider any open positions for Groszek on the Osco side. Tr., p. 388.

Rosy admitted that Groszek, with her restrictions, could have performed the essential

functions of the fuel clerk position, yet she was not considered for one, even though

there were open fuel clerk positions in April of 2011. Tr., pp. 392-393.

On questioning from counsel for Jewel, Rosy testified that Groszek never asked

about the fuel clerk position, never requested a transfer to a different position and never

requested a transfer to a floral designer position; Rosy conceded that she never raised

any of these options either. Tr., pp. 395-396, 405. Rosy testified that she "always asks

associates if they are interested in a different position or in a position that they feel they

would be capable of performing. And then we will go through the job responsibilities,

the job functions of the position." Tr., p. 406. She testified that, "if I feel that an

associate would – that their restrictions would be such that their abilities and restrictions

would fit into a position, I'll discuss that with them. Or if they show any type of interest

or indicate any position they would like to consider, then I will go through it with them.

And then I will check and see if there is availability within wherever they – if it is a part

time or whether they think they would be interested in, what parameters of geographic

location." Tr., p. 407. Rosy testified that, when she spoke with Groszek, Groszek "stated that there were no other positions within the store that she was interested in. And then she did tell me that she had been going to school for – she said she was off for a year and a half, and that she was going to school to get into a less physical profession or job function." Tr., pp. 407-408. Rosy also testified that Groszek never requested any assistive devices that would help her perform the essential functions of a position. Tr., p. 408. Nor did she request a transfer to a different store. Tr., p. 410. Rosy testified that, after Groszek was terminated, she never reached out to the medical accommodations department to seek another position or attempt to return to work. Tr., p. 412. Rosy admitted that, in her one conversation with Groszek, she never offered Groszek any position in which she could be accommodated; nor did she ever offer Groszek a position in another store.

Next, the Court heard from Kathy Lillie, a personnel coordinator and cashier for Jewel at its New Lenox store. Tr., p. 437. Lillie testified that open part-time positions are posted in the store for a three-day period, usually beginning on a Wednesday or Thursday, and that an employee interested in a part-time position in a particular store would have to come into the store to view the postings; they are not available on line or in any other form. Tr., p. 438. Lillie testified that she worked with Groszek at the New Lenox store, where the majority of the approximately 120 employees were part-time workers. Tr., p. 438. Lillie testified that she spoke with Groszek while she was out on leave and that Groszek told her she was interested in coming back to work at Jewel. Lillie testified that she received Groszek's restrictions and faxed them to Rosy; she testified that Rosy never contacted her after that and never talked to her about possible

31

accommodations for Groszek.  Tr., pp. 440-441.  On questioning from the company,

Lillie testified that, when Groszek would come in to the store, she would speak with

Lillie, but that she never indicated that she was able to return to work as a deli clerk or

in any other position; nor did she ever ask about open positions.  Tr., p. 442.

Brooke Groszek testified next.  She testified that, since July of 2013, she has

worked as a "visual" for Carson's, decorating and putting up displays.  Tr., p. 446.

She testified that she previously worked at Jewel as a deli clerk, and that she had been

employed by Jewel from 2007 through March 1, 2011, when she was terminated

because she "could no longer meet their requirements for work."  Tr., p. 447.   She

testified that she was restricted to lifting five pounds above her head and fifteen pounds

from the ground to her waist.  Tr., p. 449.   Groszek testified that she gave her release

to Jewel some time before February 14, 2011, but that she never heard from anyone at

Jewel about whether they could accommodate her restrictions before her termination

date, which was March 1, 2011.  Tr., pp. 452-453.  She testified that she spoke to

Sharon Rosy, but not until after her termination date.  Tr., p. 453.  She testified that, at

that time, Rosy did not discuss any other open positions that were available within the

company, and seemed to have already made a decision that Groszek could not return

to work.  Tr., p. 453.  Groszek testified that if Jewel had offered her a cashier position,

she would have taken it and believes she could have handled the job.  Tr., p. 457.

On questioning from the EEOC, Groszek testified that she first injured her

shoulder in March of 2009 and had surgery in February 2010; she testified that, before

the surgery, she was assigned "light duty" work through Jewel's TAW program and was

going through physical therapy.  Tr., pp. 458, 460.  She testified that the surgery was

not successful in healing her shoulder because she had an infection and her physical therapy was delayed while she waited for her wound to heal. Tr., pp. 460-461. She testified that her permanent work restrictions were no overhead work, low frequency lifting from floor to waist of up to fifteen pounds, and low frequency lifting from the waist to the crown up to five pounds. Tr., p. 461. She testified that she never looked into the physical requirements for the cashier job and never talked to anyone about what it would take to become a cashier; nor did she talk to anyone about what it would take to become an employee in the floral department. Tr., p. 475. She testified that neither she nor Rosy raised the possibility of her moving to a different store. Tr., p. 475.

Finally, the Court heard from Luigi De Matteo, store director at the Jewel store located at State and Ohio Streets in Chicago. De Matteo testified that he has worked for Jewel for fourteen years. Tr., pp. 480-481. He testified that there are two unions at Jewel: 1546 covers deli and market employees, and 881 covers the rest of the store. Tr., p. 484. He testified that when he joined the store management training program, he had to leave Union 1546 and join 881, and he had to start all over in terms of seniority and lost his pension. Tr., pp. 485-486. He admitted, however, that someone with more than five year's experience would not lose her pension. Tr., p. 503.

Jewel then showed another video of the deli department and deli back room at the Schaumburg store, and De Matteo provided a narrative of what was reflected in the video. Tr., pp. 487-493. De Matteo testified that, given Groszek's restrictions, she could not perform the essential functions of the Chef's Kitchen employee. Tr., pp. 496-497. De Matteo admitted, on questioning from the EEOC, that he did not know Groszek, knew nothing about her medical condition and was never involved in any of

33

the accommodations decisions regarding her request to return to work.  Tr., p. 497.  De

Matteo also testified that it would be very difficult to use assistive devices in the deli

department because of the space constraints, though he admitted that he had never

tried any devices out to see if they could be used.  Tr., p. 498-499.  He testified that he

would never use a ladder or similar assistive device "because of space too and

limitations," though he admitted that he had no information concerning the size of such

devices.  Tr., p. 502.  De Matteo also testified that there are typically about 15

employees working in the deli department at any given time and he admitted that the

employees routinely work together to help each other out.  Tr., p. 504.

Finally, the Court heard from Paul Schwartz, a Rehabilitation Engineer and the

Assistive Technology Manager of the Vocational Rehabilitation Institute at the University

of Wisconsin-Stout ("VRI").  Schwartz testified that, in addition to having a bachelor's

degree in civil engineering and a master's degree in industrial engineering, he is a

certified professional ergonomist, a certified assistive technology professional and a

certified rehabilitation engineering technologist.  Tr., p. 514.  As part of the Consent

Decree process, Schwartz prepared an Accommodations Consultant Report for Jewel,

issued September 30, 2011.  *See* PX 2.  Schwartz testified that he was asked "to look at

all possible scenarios of accommodations based on [Jewel's] common restrictions for

injured . . . employees.  So that way Jewel could have a toolbelt to help them provide

accommodations."  Tr., p. 521.  He testified that he was selected by both the EEOC and

Jewel to perform the work and prepare the report.  Tr., p. 522.

Schwartz testified that one of the first things he did in connection with his work for

Jewel was to contact Scott Ege, a physical therapist who had performed what was

34

essentially a functional capacity assessment for all of the different jobs within Jewel; he used Ege's job descriptions in preparing his report. Tr., p. 523. Schwartz testified that he also met with Rosy and other members of Jewel's medical accommodations team and human resources department and that, throughout his work on this project, Jewel was "great" and "very accommodating." Tr., p. 524. Schwartz testified that he also conducted site visits, driving around to various stores in and around Chicago to observe all the different positions at the different stores, looking at the different jobs and observing what the requirements for those jobs would be. Tr., pp. 524-525. He testified that, in addition to observing what was going on in the stores, he spoke to store managers and took measurements of horizontal and vertical distances for reach, measuring how high shelves were and things of that nature. Tr., p. 526. Schwartz testified that, in his report, he makes certain recommendations, including a recommendation that if the medical accommodations team is unable to come up with an appropriate accommodation, they should contact outside resources such as the Job Accommodations Network, which is a program funded by a longstanding federal grant which is free to consumers and employers. Tr., p. 529-530. Schwartz testified that he also recommended that Jewel refer to OSHA's Guidelines for Retail Grocery Stores, *see* PX 4, because sometimes accommodations and modifications that are recommended for preventing workplace injuries can also be helpful when trying to figure out an accommodation that becomes necessary post-injury. Tr., p. 531-532.

Schwartz testified that he was familiar with the "buddy system" where an employee who is unable to lift an item on his or her own asks someone to come over and either assist with the lifting or lift it for him or her. Tr., p. 532-533. He testified that

35

back injuries cost companies a ton of money so they typically encourage this type of strategy.  Tr., p. 533.  He also testified that, although many of his recommendations deal with a single limitation, when confronting the ("very common") situation where an employee has multiple restrictions, you would want to "look at each limitation independently to look at accommodations" and then, "when you actually put it all together you make sure they all can work in syntony with one another."  Tr., p. 533.

Schwartz also testified that he provided in his report a "representative sample" of devices that can be used to accommodate an employee's restrictions.  Tr., p. 534. He testified that, in terms of assistive devices, "there's a lot out there" and devices can even be tailor made to fit a particular situation; he testified that the Stout VRI has its own fabrication shop and can either modify an existing device or make one from scratch. Tr., pp. 534-535.  In fact, he testified, his fabrication department has in the past fabricated assistive devices for use in grocery stores; for example, for a cashier who had a bending restriction, the Institute made "a little custom box to fit under the plastic bags that are at the end of the conveyor, so when she placed the products into the bags she didn't have to reach down as far."  Tr., p. 535.  He testified that, to make something like that, the Institute would charge $55 per hour.  Tr., p. 535.  Schwartz testified that the accommodations he recommended in his report are all appropriate for the typical Jewel store environment.  Tr., p. 542.  Schwartz testified that no one from Jewel has ever asked him to assist in fashioning an accommodation.  Tr., p. 542.

In rebuttal, Jewel re-called David Batjes to the stand; he testified that he had reviewed the Schwartz report and had done some research (the week before the hearing) into devices similar to those listed in the report.  Tr., p. 548.  He testified that,

based upon some Internet searches, he had some safety concerns about having these devices in the stores, out on the floor and in the aisles.  Tr., pp. 551, 554-555.  But he conceded that pallet jacks, u-boats and other stock carts pose similar risks and are routinely used in stores and around customers.  Tr., p. 555.

**The Parties' Post-Hearing Briefs**

Following the hearing, the parties submitted post-hearing briefs.  The EEOC submitted proposed findings of fact and conclusions of law.  Briefly, the EEOC urges the Court to find that many resources were available to help Jewel fashion accommodations for employees who wanted to return to work with restrictions, and that Jewel failed to take advantage of these resources, failed to consider transfers to open positions for employees with restrictions, failed to consider the use of assistive devices for employees with restrictions, and made little or no effort to accommodate Pillie, Epting or Groszek, in violation of ¶5 of the Consent Decree.   The EEOC asks the Court to find that each of these employees sought a return to work after disability leave, that each (even with her restrictions) was capable of performing the essential functions of an alternative job at Jewel, that there was an open position available in that alternative job and that, despite all of this, Jewel never offered these individuals an alternative job. Indeed, the EEOC argues, Jewel could have accommodated all three women, but did not; Jewel never offered these individuals anything in the way of an accommodation. The EEOC argues that Jewel's conduct "stems from a lack of diligence in complying with the Consent Decree's mandate."  EEOC's Proposed Conclusions of Law, p. 2.  And that such conduct, in direct violation of the Consent Decree, warrants contempt.   The EEOC argues that it is entitled to monetary relief to compensate Pillie, Epting and

37

Groszek for their losses, as well as sanctions to coerce Jewel's future compliance with ¶5 of the Consent Decree; it also seeks a one-year extension of the Consent Decree, the appointment of a special master to monitor and assess Jewel's compliance with ¶5, and an award of attorneys' fees and costs.

Jewel submitted a brief laying out the evidence and its arguments in opposition to the contempt motion. Jewel argues that the EEOC failed to meet its burden of proof, failed to introduce evidence showing that each of the employees at issue was entitled to the protections of the ADA, and failed to introduce evidence of reasonable accommodations that would have allowed them to perform the essential functions of their positions or other positions.

## **DISCUSSION**

### **Violation of the Consent Decree**

To hold a party in contempt, there must be "a decree from the court which 'set[s] forth in specific detail an unequivocal command' which the party in contempt violated." *Stotler & Company v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989)(citing *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir. 1986); *H.K. Porter Co. v. National Friction Prods*., 568 F.2d 24, 27 (7th Cir. 1977)). "To win a motion for civil contempt, a party must prove 'by clear and convincing evidence' that the opposing party violated a court order." *Goluba v. School District of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995)(quoting *Stotler,* 870 F.2d at 1163; *Hayden v. Oak Terrace Apartments,* 808 F.2d 1269, 1270 (7th Cir.1987)). To impose sanctions, the court "must be able to point to a decree . . . 'which sets forth in specific detail an unequivocal command' which the party in contempt violated.'" *Stotler,* 870 F.2d at 1163 (citations omitted). The court does not, however, "ordinarily have to

38

find that the violation was 'willful'" and may find a party in civil contempt if that party has

not been "reasonably diligent and energetic in attempting to accomplish what was

ordered." *Id.* (citations omitted).

Here, there is no dispute that the parties signed a Consent Decree and that the

District Court entered the Decree on January 4, 2011; nor is there any dispute that the

Decree included a specific command to the company to stop discriminating against

employees trying to return to work after a disability leave.   Paragraph 5 of the Decree

provides:

> The Company is hereby enjoined from discriminating on the basis of
> disability by not providing reasonable accommodation(s) to persons
> desiring to return to work from a disability leave.

Indeed, Judge Guzman, in ruling on the parties objections to this Court's last decision,

noted as much: "the Decree expressly states that the defendants are enjoined from

discriminating on the basis of disability by failing to provide reasonable accommodations

to those seeking to return to work from a disability leave. The language is unambiguous

. . . ." *EEOC v. Supervalu*, No. 09 C 5637, Memorandum Opinion and Order issued

3/19/14, p.10 [191].

What's more, the documentary evidence and testimony make clear that Pillie,

Epting and Groszek all asked to be returned to work after disability leave, that they

presented restrictions, thereby triggering the company's interactive process, and that,

ultimately, the company refused to allow them to return to work with or without

reasonable accommodations.  More specifically, the evidence shows that, in making the

determination that these employees could not be accommodated, the company

disregarded its own interactive process guidelines, failed to even consider the myriad

39

resources available (at no cost or at minimal cost) to assist it in identifying or fashioning reasonable accommodations for these employees, and failed to consider reassignment to alternative positions.  In fact, the evidence shows that the company could have accommodated these individuals with reassignment to alternative open positions (the physical requirements of which were within their restrictions), but that the company simply elected not to pursue such accommodations.  To be sure, the company had made similar accommodations in the past; it simply did not do so in these three cases.

In its defense, Jewel argues that it has a "rigorous system" in place for ensuring that those employees who want to return to work after a medical leave are able to do so; it argues that it has an interactive process that includes at least six attempted points of contact, which results in a 70% success rate with respect to accommodations.  Even if that were true, that still leaves 30%.  If Jewel failed to abide by the Consent Decree in these 3 cases – or in the remaining 30% of the cases – it still violated the Consent Decree.  Worse yet for the company, the evidence adduced at the hearing on the EEOC's motion paints a very different picture about the company's system.

Jewel spends a substantial portion of its brief arguing that none of the claimants could perform the essential functions of her job.  But, as the Court understands it, that is not disputed.  Indeed, that is precisely the point: to return to work, each of the claimants needed a reasonable accommodation, whether that meant the use of assistive devices, a transfer to a less physically demanding position, or some other accommodation.

Jewel also argues that, during the hearing, the EEOC "failed to present evidence that any of the claimants was able to return to work with or without a reasonable accommodation" and that "it is undisputed that the [Medical Accommodations

40

Administration Team] worked closely with each of the claimants to gain an understanding of their physical limitations and their ability to perform the essential functions of their positions or other positions with or without reasonable accommodation."  Jewel's Post-Evidentiary Brief, p. 2.   These assertions leave the Court wondering whether Jewel may have attended a different hearing than the one this Court presided over.

     According to the evidence submitted at the hearing, the Medical Accommodations Administration Team did not even contact Groszek until after she had been terminated.  With respect to Pillie, the evidence shows that, although Rosy did talk to her – and although Pillie did ask to be reassigned to a scan coordinator position (a position Rosy conceded was within Pillie's restrictions) – the process was hardly "interactive."  Rosy told Pillie that her home store didn't have any open scan coordinator positions.  And that was the end of the matter.  No one from the Medical Accommodations Administration Team ever followed up with Pillie's home store to see if any additional positions opened up between the time Pillie asked to return to work and the time she was terminated.  No one from the Medical Accommodations Administration Team bothered to talk to Pillie about taking one of the open scan coordinator positions at a nearby store.  No one from the Medical Accommodations Team ever bothered to see if Pillie wanted to try the cashier position, or any other position.  At the hearing Rosy admitted that she did not consider other open positions for Pillie because she was a part-time employee and part-time employees typically want positions "closest to their home"; Rosy also testified that Pillie never requested a cashier position.  Tr., p. 107.  Rosy also testified that Pillie never requested any kind of assistive device to help her

41

perform the essential functions of her job, and never asked to look at a position in a different store.  Tr., pp. 108, 117.

This is precisely the attitude that gets the company into trouble.  Rosy admitted that the interactive process guidelines apply to part-time employees and that they provide that the company will consider open positions without any request or magic words from the employee.  She admitted that she failed to follow these guidelines and, essentially, blamed Pillie for her failure.

The process was equally one-sided for Epting.  Ann Schilling testified that she never even met Epting.  And Rosy admitted that she knew Epting had requested an accommodation that would have allowed her to seek assistance from other employees to lift items beyond her restrictions; Rosy dismissed that suggestion out of hand.  Yet she never offered Epting anything else in the way of any accommodation.  Rosy testified that, in her discussions with Epting, Epting never asked to transfer to a different position; she never offered to take a union position; she never indicated she was willing to take a pay cut; never asked to transfer to a corporate position; never requested a marketing support position; never requested a pharmacy tech position; never asked to use any assistive devices; and never asked to be transferred to a different store.  Tr., pp. 208-210, 212.  In short, she blamed Epting for not coming up with a solution to her problem – despite the fact that the company's interactive process guidelines place the burden on the company, not the employee, to provide a reasonable accommodation.

The Court saw no evidence to support the company's post-hearing assertion that it "worked closely" with these employees.  In each of these cases – regardless of how the company's rigorous process was supposed to work – there was little or no effort to

come up with any sort of modification or accommodation that would allow the employee to return to work. Of course there are going to be times when an employee's restrictions – possibly coupled with the employee's unwillingness to be flexible in considering other open positions or other stores – will preclude the provision of any reasonable accommodation. But that decision must be made, via the interactive process, after such accommodations are thoughtfully considered and rejected. That did not happen here.

The EEOC has asked the Court to modify the Consent Decree to require the company to consider assistive devices and reassignments in making its accommodation decisions. Initially, such a modification would seem to be unnecessary in light of the evidence, as everyone involved believed such things should have been considered under the interactive process guidelines. Additionally, although not specifically delineated in the Consent Decree, the company's reasonable accommodation obligation certainly included potential reassignment to open positions within the employee's qualifications and restrictions. Rosy admitted as much on the stand. And the Seventh Circuit has said as much. *See, e.g., Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 677 (7th Cir. 1998)("It is well established that under the ADA, the employer's duty reasonably to accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified.")(citing 42 U.S.C. § 12111(9)(B)). Indeed, as the Seventh Circuit noted, "[t]he option of reassignment is particularly important when the employee is unable to perform the essential functions of his or her current job, either with or without accommodation or when accommodation would pose an undue hardship for the employer." *Dalton*, 141 F.3d at 677 (citing 29

43

C.F.R. Pt. 1630, App. § 1630.2(o)).  The ADA "places a duty on the employer to

'ascertain whether he has some job that the employee might be able to fill.'"  *Dalton*,

141 F.3d at 677.  Thus, even without the modification requested by the EEOC, the

Consent Decree clearly imposes a duty on the company to consider whether

reassignment is feasible.

The Consent Decree also required the company to consider whether assistive

devices could be used to help an employee return to work.  More specifically, the

Decree required the company to use Schwartz's list of possible accommodations in

trying to return disabled employees to work.  *See* JX1, ¶28.  On the issue of what is a

reasonable accommodation, Paul Schwartz's report notes that

> [e]very specific accommodation case is different.  Job accommodation
> solutions are not a 'one size fits all' system, even with individuals with the
> same diagnosis.  The accommodations detailed here are a starting point
> to investigate possible solutions for an individual.  A thorough onsite
> assessment of the individual with the functional limitations will yield the
> best possible opportunity for reasonable accommodations at the
> workplace.

Schwartz Report, p. 12 (PX2).  The report suggests generally that possible

accommodations may include the use of an actual product – i.e., a stool – or non-

product based accommodations such as changes to the way a job is done or structured,

modifications in workplace policies, procedures and schedules or the elimination of

marginal functions.  Schwartz's report notes that "Jewel Osco has accommodated

associates in the past using these techniques."  *Id.*  In addition to these general

suggestions, Schwartz's report provides a list of possible accommodations for each job

title grouped by physical function; according to Schwartz, the list is a "starting point" in

the accommodation analysis.  *Id.*, p. 13.  Also included in the EEOC's exhibits is a

report of the worksite modification consultation services provided in connection with this case by the University of Illinois at Chicago's Assistive Technology Unit (PX3) and the OSHA Guidelines for Retail Grocery Stores on Ergonomics for the Prevention of Musculoskeletal Disorders (PX4). Paul Schwartz testified that he offered these to the company as additional resources in his report.

But, despite what the Consent Decree said, there is no evidence to suggest that anyone from the company's Medical Accommodations team ever utilized or considered Schwartz's report or the resources cited therein. And, in fact, there is nothing in the record to suggest that the company meaningfully considered accommodations for these three employees. In fact, the evidence shows that the company really did not consider *any* of the accommodations suggested by Schwartz's report when it determined that Pillie, Epting and Groszek could not return to work. Indeed, the witnesses who testified for the company were very dismissive of the notion of allowing any assistive devices to be brought into the stores. Ann Schilling, Jewel's educational coordinator, testified that she knew the EEOC regulations provided that a reasonable accommodation could include the use of assistive devices but that she did not consider the use of such devices for Epting. Tr., p. 316. Sharon Rosy assured the Court and the EEOC that she knew all about assistive devices from her background in the rehabilitation field and that she knew when they might be helpful to assist an employee in performing the essential functions of her job. Yet she also admitted that she never considered them for any of these employees. She was dismissive of Epting's "buddy system" suggestion, despite the testimony from Paul Schwartz, the *actual* accommodations and assistive device expert, who said it was a common and effective accommodation.

45

The rest of the company employees were equally dismissive about the use of assistive devices. Luigi De Matteo testified that it would be very difficult to use assistive devices in the deli department because of the space constraints, though he admitted that he had never tried any devices out to see if they could be used and knew nothing about the dimensions of such devices. Tr., pp. 498-499, 502. David Batjes testified that, based on some Internet research he did just before the hearing, he had some safety concerns about having assistive devices in the stores, out on the floor and in the aisles. Tr., pp. 551, 554-555. But he conceded that pallet jacks, u-boats and other stock carts pose similar risks and are routinely used in stores and around customers. Tr., p. 555. And Schwartz made clear that the devices he suggested are used routinely in the workplace.

Quite simply, the evidence is overwhelming that the company did not do what it was supposed to do under the Decree. Rosy testified that, once the company's interactive process guidelines were triggered – which happened whenever an employee who was on disability leave requested a return to work and presented restrictions – the Medical Accommodations Team was supposed to collect information concerning the employee's restrictions; information about the employee's past assignment, including possible accommodations or modifications that might be available to assist the employee in performing the essential functions on that job; and information concerning possible reassignments. Tr., pp. 36-37, 43, 46-47. She testified that the company training materials indicated an expectation that the company would review available jobs in other business units as a reasonable accommodation, which she took to mean other store locations and other assignments within the employee's home store location. Tr.,

pp. 49-50. Rosy admitted that she did not do any of this for the three employees at issue here. And the other testimony and documentary evidence confirms that no one else did either.

Remedy and Damages:

Having determined that clear and convincing evidence shows that the company violated ¶5 of the Consent Decree, the Court must determine what remedy or sanction, if any, is appropriate. "The primary purpose of sanctions for civil contempt is to coerce the contemner into future compliance with the Court's order and to compensate the complainant for losses sustained for past non-compliance." *Cannon v. Loyola University of Chicago* , 676 F.Supp. 823, 828 (N.D. Ill. 1987)(citing *Local 28 of Sheet Metal Workers v. EEOC*, 478 U.S. 421, 443 (1986)). And the fact that the violation of the Decree may have been unintentional is irrelevant; the Seventh Circuit has instructed that "[t]he district court may find a defendant in civil contempt if [it] has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *American Fletcher*, 688 F.2d at 517 (quoting *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.), *cert. denied*, 454 U.S. 832 (1981)). This is certainly true here, and the Court finds that some sanction is warranted.

In fixing an appropriate sanction, the Court's goal is to compensate Pillie, Epting and Groszek for the losses they suffered as a result of Jewel's violations of the Decree and to coerce the company into complying with the letter and spirit of the Decree in the future. The EEOC urges the Court to award all three claimants backpay, plus interest (taking into account mitigation), and to award Pillie frontpay as well. Additionally, the EEOC urges the Court to fine the company $10,000 per day until the company hires a

rehabilitation engineering professional it can consult before refusing to return any given employee to work from disability leave, as well as $10,000 per day until the company certifies that it has instructed all members of its Medical Accommodations Team that part-time employees seeking a return to work should be considered for other open positions. The EEOC also seeks an extension of the term of the consent Decree, the appointment of a special master, and reimbursement of the attorneys' fees and costs it incurred in bringing the contempt motion and conducting the evidentiary hearing.

The Court finds that a compensatory sanction is appropriate. The EEOC asks the Court to award backpay from the date the company refused to accommodate each claimant, to the date of the judgment. The Court agrees with the proposal, but finds that the appropriate start date is not, as the EEOC suggests, the date the request to return to work was initially refused, but the date the company severed the employment relationship (or allowed it to be severed), rather than returning the employee to work; this is really when the company "discriminat[ed] on the basis of disability by not providing reasonable accommodation(s) to persons desiring to return to work from a disability leave." *See* Consent Decree (JX1), ¶5.

Accordingly, based upon the evidence submitted by the EEOC concerning wages,[6] the Court recommends awarding backpay as follows:

a.      For Irene Pillie: at the rate of $564.40 per month for the period from January 26, 2011 to June 30, 2011 (when she was receiving disability), a total of $2,822; at the rate of $1550.40 per month for the period from July 1, 2011 to March 31,

---

[6]Although Jewel disputes that the EEOC is entitled to monetary damages, it does not challenge the wage rates put forth by the EEOC.

2013, a total of $32,558.40; and at the rate of $766.65 per month for the period from April 1, 2013 through the date of this decision (to reflect her Target wages in mitigation), a total of $11,116.43, making Pillie's total backpay award $46,496.83, plus interest.

.	b.	For Darsheta Epting: from March 17, 2011 through the end of 2012 at the rate of $807.20 per week, less the wages she earned in mitigation, for a total of $10,714.43 ($6,142.03 for 2011 and $4,572.40 for 2012), plus interest. The EEOC is not seeking backpay after 2012.

	c.	For Brooke Groszek: from March 1, 2011 through July 10, 2013 at the rate of $202.40 per week ($9.20/hour x 22 hours per week, the average of her 12-32 hours per week), for a total award of $24,895.20, plus interest.

	In addition to backpay, the EEOC also seeks two years' worth of front pay for Pillie, who was forced to take a lower paying job (a total of $23,150). In support of this request, the EEOC cites *Biondo v. City of Chicago*, 382 F.3d 680, 691-92 (7th Cir. 2004), a case involving claims that the Chicago Fire Department's promotion examination and standardized lists violated 42 U.S.C. §1983 and Title VII of the Civil Rights Act of 1964. Although *Biondo* recognizes that "[t]he goal of front pay is to put the victim in the financial position he should have enjoyed" absent discrimination, the case has nothing to do with violation of a consent decree or a civil contempt finding. And, given that we are recommending an award of backpay through the date of the judgment for Pillie, we are not inclined to award additional compensatory sanctions in the form of front pay.

	Based upon the evidence adduced at the hearing and the attitude such evidence reflects on the part of the company, the Court finds that a coercive sanction is also

appropriate. The Court is not persuaded that the fines suggested by the EEOC would serve the goal of getting the company to comply with the Decree. Nor do they add anything that is not already required or available under the Consent Decree or the company's own interactive process guidelines. The Court does agree, however, that the appointment of a special master is appropriate. The special master – who will be paid by the company – will review the decisions of the company and its Medical Accommodations Team to ensure compliance with the letter and spirit of the Consent Decree. The Court further finds that the term of the Consent Decree should be extended for one year from the date of this decision to ensure that the company is meeting its obligations in this regard. Finally, as an added incentive to prevent future violations, the Court finds that the EEOC should be reimbursed for the reasonable fees and costs it incurred in bringing and pursuing the contempt motion.

## IV. CONCLUSION

For the reasons stated above, we respectfully recommend that the District Court grant the EEOC's motion finding the defendant in contempt for violating ¶5 of the Consent Decree [160]. Additionally, we respectfully recommend that the District Court impose sanctions on the company that are both compensatory and coercive in nature, as outlined in greater detail above. We also respectfully recommend that the District Court extend the term of the Consent Decree for one year; appoint a special master (to be paid by the company) to ensure that the company's treatment of employees seeking to return to work after disability leave complies with the Consent Decree; and order the company to reimburse the EEOC for the reasonable fees and costs it incurred in bringing and pursuing the contempt motion.

Specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Fed. R. Civ. P. 72. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

Dated: July 15, 2014

ENTERED:

_____

MICHAEL T. MASON
United States Magistrate Judge